Johnson, Chief Judge.
It is conceded that the city, by the construction of the avenue and sewer, has rendered it permanently impracticable to again have or use surplus-water power covered by the Clark 'Williams’ lease, at the-point owned by Eos.
The only question we shall consider is: Has the city, by its improvement, rendered itself liable in, damages to the-plaintiff? The act under which it accepted the grant of that part of the canal, is as follows (60 Ohio L. 44):
“AN ACT to authorize the city of Cincinnati to enter upon and occupy a part of the Miami and Erie canal as a public highway and for sewerage purposes.
“ Sec. 1. Be it enacted, etc., That authority and permission shall be granted, in the manner pointed out, to the city of Cincinnati, to enter upon, improve, and occupy forever as a public highway and for sewerage purposes, all or any of that part of the Miami and Erie canal which extends from the east side of Broadway in said city to the Ohio river, including the width thereof as owned or held by the state; but the said grant shall be made subject to all outstanding rights or claims, if any, with which it may conflict.
“ Provided, that no work shall be done by said city authorities on the premises hereby granted, until the plan of improvement shall be approved by the board of public works.
“ Sec. 2. The said grant shall not extend to the revenues derived from the water privileges in said canal, which are hereby expressly reserved.
“And the said grant shall be made upon the further condition that the said city, in the use, as aforesaid, of all or any of said portion of said canal, shall not obstruct the *498 flow of water through, said canal, nor destroy nor injure the present supply of said water for milling purposes; and •that said city shall be liable for all damages that may accrue from such obstruction or injury. But it is not intended hereby to relieve the lessees of said canal, or their assignees, from any responsibilities imposed upon them by an act to provide for leasing the public works of the state, passed May 8,1861; or by the instrument of lease executed in pursuance of said act; except as and to the extent they .may be interfered with, as said city may, from time to time, <enter upon, improve, and occupy any part of said grant.”
In the case of The Little Miami Elevator Co. v. Cincinnati, 30 Ohio St. 629, we had occasion to examine and comment ■on the provisions of this act at some length. Upon a review of what was then said, so far as affects the present •question, we are content with the construction there given this statute. It was there held that the reservations and ■conditions annexed to the grant to the city were not intended to reserve to the state, nor to the lessees of the public works, the right, after that part of the canal had been .abandoned by the state as a canal, and after the title had vested in the city, to create new water rights not theretofore .-existing; and that this grant, and the construction of the highway and sewer upon a plan of improvement approved by the board of public works, which destroyed the canal ■for purposes of navigation, was an abandonment of it for .such purposes, and this by operation of law was a surrender by the state of the incidental rights of the state to sell or lease the surplus water along the part so abandoned, not •expressly saved to lessees of water privileges as outstanding rights or claims under contracts existing at the time of such rabandonment. Hence it was held, upon the facts in that •case, that a sale or lease of surplus water, after such aban■donment, and after the title and possession had vested in •the city, could not operate to vest in the grantee any right to compel the city to so construct its improvement as to •preserve such water power for the use of the purchaser or lessee. In reaching that conclusion, it became necessary to *499 •consider the legal effect of the reservations and conditions of the act, that the grant “ shall be subject to all outstanding rights or claims, if any, with which it may conflict,” and that “the said grant shall not extend to the revenues derived from the water privileges in said canal, which aro hereby expressly reserved,” and that in the use of said canal the city should not “ obstruct the flow of water through said canal, nor injure nor destroy the present supply of water for milling purposes,” and should be liable “ for all dam.ages that may accrue from such obstruction or injury.”
Upon these provisions we restate what was then incidentally said, that some of these provisions looked to the rights and interests of the state, such as the saving of the revenues and the flow of water from above through the .sewer; some to the interests, if not to the rights of the then lessees of the canals, and some to the rights and equities of the lessees of water power, but that none of these reservations or conditions contemplated the future use by the state of that part of the canal for purposes of navigation, but only to flow water through ; nor did they save to the state the surplus water power not theretofore leased or granted.
It was further said that the intention was to protect existing rights, if any, of lessees of water privileges, and make the city liable for damages to them, as well as to the ■state, or its lessees, for the obstruction of the flow of water from Broadway to the river.
"We further add that it is also a condition of said grant that the city should not injure or destroy “the present supply of water for milling purposes,” and that it “ shall be liable for all damages that may accrue from such obstruction or injury,” and that these provisions are for the benefit of individuals injured as well as for the state.
TIence it follows that if Eox had rights there which were saved, he is entitled to maintain this action; that is, if it was the duty of the city so to construct its sewer as to provide a head of water at that point equal in quantity and power to that furnished before the factory burned down in .1855, then the city is liable; otherwise, not.
*500 1. That clause of this statute which says, “but the said grant shall be made subject to all outstanding rights or claims, if any, with which it may conflict,” has already received a judicial constructiou which we adopt.
In Hubbard v. Toledo, 21 Ohio St. 379, it was held “that, the abandonment of her canals by the state creates no liability on her part to respond in damages resulting therefrom to parties holding leases of surplus water,” and that the liability of the city, provided for in the clause above quoted, is restricted to those rights and subjects for an injury to-which a legal demand would accrue against the state, resulting from such abandonment; that is, that the city was substituted for the state, and made to assume such liabilities as the state would have been liable for by reason of the-abandonment.
It is there said, on page 398: “ But the abandonment of the canal by the state has the same effect upon their privilege as would a resumption of the grant. Since, then, the consequences of resumption and of abandonment are identical, it is incredible that a liability should arise by implication from the latter, which, by express negation, can not from the former. If it were otherwise, the state would be compelled to maintain her canals, at any sacrifice, for the exclusive benefit of the lessees of the surplus water. This can not be. The creation of water power did not enter into the purpose of their construction. It was adventitious, incidental, and, therefore, necessarily precarious; and those obtaining grants thereof must be supposed to have taken them subject to the fluctuations of tides and the changes of time. Hence, it seems to us to have been the-obvious intention of the law, and of the lease under it,
. . . that the privilege granted to the plaintiffs should continue for such p>eriod, not exceeding that specified, as the state might see proper to maintain and operate the canal, unless sooner terminated for some of the reasons, specified in the statute. In this view, we are sustained by
. . . 25 Ind. 409. . . . The result, then, is that, if as above assumed, the liability of the city was by the *501 •statute restricted to, and substituted for, that of the state, it follows that, as no legal demand accrued to the plaintiffs .against the state, they can not recover against the city.”
And, on page 399: “ Hence, as whatever claims or rights 'plaintiffs had under their lease might be lawfully terminated by an abandonment of the canal, such abandonment could not, in any legal sense, conflict with them. It was only rights and claims that might not be lawfully terminated by the state, with which a conflict was possible. . . The plaintiffs’ lease did not vest in them such claim or right. They had a mere license, which the abandonment extin.guished;”
The injury complained of, in that case, was the abatement of an aqueduct on the Manhattan branch of the Miami and Erie Canal, which conducted the water to the plaintiffs’ mill. He was the owner of an existing water privilege, used in operating his mills, and this abatement •of the aqueduct destroyed his water power. His injury ■was to existing mills, that were using a present supply of water. Eor this reason, the case is stronger than that of the present plaintiff.
The above quoted clause from the Cincinnati act is identical with the clause in section 1 of the Toledo act. Hence, the grant to the city was, under this clause, subject only to -such outstanding rights and claims of Eox, as he would have had against the state for the abandonment of that part of the canal, and for the refusal to keep in repair that lock, so as to keep up a water power.
The lease under which Eox claimed provided (29 Ohio ,L. 380) for the resumption by the state of the surplus water, whenever needed for navigation, and the rent to be paid, or ■a reasonable part should be remitted or refunded for the time the lessee was deprived of water. The state evidently contemplated a permanent use of the canals, if public policy required their maintenance, but the right of the state to -abandon them, or to resume the grant, was not abridged or ¡surrendered by the lease, though it was in perpetuity.
Neither party to the lease, doubtless, contemplated the *502 probability of the abandonment of the canal for purposes-of navigation. That it would continue to be used as a canal, seems to have been so confidently relied on, that the-lease contains no provisions providing for a different event. The lessee required from the state no stipulations for his-security, in the event of such an abandonment, and none-were inserted.
The lessee took upon himself the risk of such an event, whenever the state, in the exercise of its sovereign power, deemed it for the public welfare that the canals should not be kept up. The lease expressly provides for damages for a non-supply of water, when it is necessary for navigation,, but makes none for damages for non-supply in other cases.
The exercise of the reserved right of the state to abandon the canal, and thus cut off' permanently the supply of surplus water, created no obligation, on the part of the-state, to respond for damages to a lessee; and if none existed against the state, none was imposed on the city by accepting the grant. The right or claim that did not subsist against the state did not accrue against the city.
As the state was under no obligation to keep up and in repair the canal and locks, but might abandon it, no obligation was imposed upon the city, by this clause of the act, to repair this lock, and restore the original supply of water,, as it had existed in 1855. Hubbard v. Toledo, 21 Ohio St.. 379; The, Trustees v. Brett et al., 25 Ind. 412; Fishback v. Woodruff, 51 Ind. 102.
We will assume that it was competent for the state to require that the city should repair and maintain this lock, so as to provide surplus water for the plaintiff. Yet, in view of the fact that this lock was out of repair; that there-was no head of water there, nor any machinery to utilize-it, if it were; that no revenues had been derived from it for many years; that, by the terms of the lease, the state-might- forfeit the lease for non-payment of rent; and that the state had ceased to keep it in repair or to use it to pass boats through, renders it extremely improbable that the-state intended to protect this water power.
*503 After the state ceased to use this lock to pass boats through, it was under no obligation to keep it up for the sole purpose of supplying water to the lessee. The power of the state to exact such a condition might well be doubted, but, if it exists, it should be expressed in such clear and unambiguous language as to admit of no uncertainty. We-assume, further, that the state has the power which is clearly expressed, to save the present supply of water for milling purposes, so long as it retains the use of the canal to flow water through from above, as incidental to the continued public use of the abandoned part as an outlet for the water of the part not abandoned.
At this lock, there was not, nor had there been for many yeai’S, any surplus water, nor any revenues derived from water privileges. After the factory burned down, it was allowed to be and remain out of repair and unused for many years. The state had the clear right to proceed, if it did not, to forfeit the lease. In this condition of things, the grant was made, and the improvement made, which operated as an abandonment for public uses, reserving to the state only the revenues derived from water-privileges, and the right to flow water through.
That the state could make such a grant, without any reservations or conditions in favor of lessees, is settled in Toledo v. Hubbard, supra.
Unless, therefore, the rights of Eox are saved by the conditions named in the secoud section of the act, and the city has violated these conditions, he has no right of action.
II. But it is claimed, that while the state may not be liable, nor the city either, for the mere vacation and neglect to keep the lock in repair, yet it has made itself liable by the improvement which makes it impossible to ever repair said lock; that by section 2 of the act it was made a condition that the highway and sewer to be constructed should not destroy or injure the present supply of water, etc.
To this we reply : 1. That these conditions, found in section 2, are in derogation of the grant, and embrace only those rights by clear intendment included in the terms; 2. *504 That the reservation of the revenues derived from the water privileges in said canal, and the inhibition against the destruction or injury to the present supply of water for milling purposes, can, by no reasonable interpretation, be extended so far as to compel the city to restore a water power, where none existed when it accepted the grant, and to restore revenues to the state from a lease under which none had been derived for many years.
By the grant, the city took the canal as it then was, without any obligation to repair water gates and locks, and restore a head of water where none existed, unless such obligation arises by reason of these conditions.
The highway and sewer were to be constructed on a plan that would not obstruct the flow of canal water through the sewer, and would not destroy nor injure the present supply of water for milling purposes; reserving, also, the revenue derived from water privileges. The city was not bound to restore water power that the state had refused to restore, nor to repair locks and gates. The grant did not contemplate this, nor did the authorized agents of the state require it, when they approved the plan of improvement.
These agents, the board of public works, sought to save existing revenues derived from the present supply of water, and to provide for the flow of water from the canal above. They assumed, as well they might, that Eox had forfeited or abandoned his lease, or that the state had, by this act and grant, abandoned that part of the canal, and relieved itself of the duty of repairing and maintaining this lock.
Indeed, it would be strange if the state should be anxious to save any dormant rights of Eox derived from the Williams’ lease. He had paid no rent for many years. He had not rebuilt the factory, and had no machinery to utilize any surplus water the state might have for sale, if the proper repairs had been made.
The state, in the proper exercise of its discretion, elected not to repair the lock, and authorized the city to destroy it, by converting that part of the canal into a sewer. By this, no surplus water, nor present supply of water for *505 milling purposes, was cut off or destroyed, for none then •existed.
We may concede that Fox had, in the absence of a forfeiture, a claim to all surplus water that the state should ever thereafter have at that point; but, as that claim imposed no obligation on the state to keep in repair the canal for the sole purpose of supplying him with surplus water, its grant to the city, for a use which rendered such repair and future supply impossible, did not invest Fox with a right against the city which he did not have against the state. Indeed, as was said in the Elevator case, such a reservation would be an intolerable burden upon the grant in all future time, and can not be predicated upon implications •or inferences founded on a doubtful construction of the act, especially when it is perfectly obvious that neither the,city, when she accepted the gift, nor the board of public works, when it approved the plan of improvement, contemplated the creation of new water privileges and new sources of revenue.
At this lock all was dilapidation and decay. The state had no surplus -water to sell, and Fox had no use for any if any had been for sale. The state had for years derived no revenues from this lease, but allowed the canal to remain unused, either for purposes of navigation or revenue .at this point. The conditions of the grant, so far as lessees of surplus water were concerned, saved only the rights’ and claims of those having a right to a present supply of water.
As Fox had ceased to use water in 1855, and had paid no revenue to the state, it might, without semblance of bad faith, treat the lease as at an end, and exercise its conceded right, to allow the lock to remain out of repair, and abandon its use. This is the legal effect of what was done. No legal injury would result to Fox. by this. Neither would such injury result by an abandonment of the canal to the •city for other public uses. So that, unless Fox’s claim is -within the saving clauses or conditions of the grant, he can *506 Lave no cause to complain. If the city, in making its improvement, obstructed the flow of water through this section, or destroyed or injured the present supply of water for milling purposes, it would be liable for such obstruction or injury.
Upon the admitted facts, the city has not destroyed or injured any present supply of water for milling purposes belonging to Fox. Therefore he has no cause of action^ for damages against the city, under the act of 1863.

Judgment affirmed.